**JOSEPH J. WISEMAN, ESQ., CSBN 107403**

**WISEMAN LAW CORPORATION**
  2810 5th Street
  Davis, California 95618
  Telephone:   530.759.0700
  Jjwiseman@wisemanlawcorp.com

**Attorney for Defendant
JOHN F. LINDER**

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) Case No. CR-11-00147-MCE |
| | ) |
| Plaintiff, | ) **DEFENDANT'S DISPOSITIONAL MEMORANDUM** |
| | ) |
| v. | ) Date:  August 9, 2019 |
| | ) Time:  10:00 a.m. |
| JOHN F. LINDER, | ) Ctrm:  Hon. Morrison C. England |
| | ) |
| Defendant. | ) |

Defendant, John F. Linder ("Linder"), by and through undersigned counsel, submits the following Dispositional Memorandum.

## INTRODUCTION

On March 7, 2013, after having plead guilty to one count of violating 18 U.S.C. § 2252(a)(4)(B), Linder was sentenced to 30 months in federal prison, to be followed by a 60-month term of Supervised Release. Among the Special Conditions imposed by the court, Linder was prohibited from possessing, owning, using, viewing, or reading material "depicting and/or describing sexually explicit conduct between adults and children under 18 and/or children individually, including computer images, pictures,

photographs, books, writings, drawings, videos, or video games." *J&S, Special Conditions of Supervision, No. 7* (Docket No. 91). The court did not impose a blanket prohibition on viewing legal pornography.[1]

Linder began his term of supervision on July 2, 2015 and expect for the violations which he admitted to in this proceeding, he has complied with the terms of his supervision. The balance of this Memorandum will address these violations. But first a review of the law.

## THE APPLICABLE LAW

According to 18 U.S.C. § 3583(e), when confronted with a violation of supervised release, the court has several options. It may continue the defendant on supervised release, with or without extending the terms or modifying the conditions, revoke supervised release and impose a limited term of imprisonment,[2] or sentence the defendant to home confinement.

A finding that a violation has occurred is only the first step in the revocation process. The court must still decide whether the violation warrants revocation. *United States v. Gallo*, 20 F.3d 7, 13 (1st Cir. 1994) (citing *Black v. Romero*, 471 U.S. 606, 611 (1985). And even when a defendant admits a violation, he must be given "an opportunity to offer mitigating evidence suggesting that the violation does not warrant revocation." *United States v. Holland*, 850 F.d 1048, 1051 (5th Cir. 1988).

In imposing a sentence for a violation of supervised release, the court must consider the applicable § 3553 factors and "impose a sentence sufficient, but not greater than necessary" to comply with the purposes of sentencing in § 3553(a)(2). United

---

[1] Consequently, the Probation Officer's Memorandum to the court is incorrect when it states under Legal History of the Case that the Special Conditions included "[n]o possession of pornographic material." *Probation Officer's Dispositional Memorandum*, at p. 2. She also made this error in the Petition for Warrant for Offender Under Supervision she filed on March 14, 2018 (Docket No. 109).

2

Defendant's Dispositional Memorandum                                    Case No.: CR-11-00147-MCE

States v. Hammons, 558 F.3d 1100, 1103 (9th Cir. 2009) (applying the parsimony clause to revocations of supervised release).

In addition to Title 18, Chapter 7 of the United States Sentencing Commission Guideline Manual likewise provides guidance to courts addressing violations of supervised release. Although that chapter is structured as policy statements and application notes, rather than specific Guidelines, it provides an analytical framework for addressing a range of violations of supervised release.

For example, under § 7B1.1, supervised release violations are classified into three grades, with Grade C violations defined as "conduct constituting (A) a federal, state, or local offense punishable by a term of imprisonment of one year or less, or (B) *a violation of any other condition of supervision*. USSG § 7B1.1(a)(3) (emphasis added).

Moreover, § 7B1.3(a)(2) provides that upon a finding of a Grade C violation, the court *may* but need not (A) revoke supervised release, or (B) extend the term of supervised release and/or modify the conditions of supervision. When supervised release is revoked, §7B1.3(b) directs the court to refer to §7B1.4 (Term of Imprisonment) to determine the appropriate custodial sanction. In the case of a Grade C violation, "[w]here the minimum term of imprisonment under [that section] is at least one month but not more than six months, the minimum term may be satisfied by (A) a sentence of imprisonment; or (B) a sentence of imprisonment that includes a term of supervised release with a condition that substitutes community confinement or home detention . . . for any portion of the minimum term."   USSG § 7B1.3(c)(1). And, finally, §7B1.3(g)(2) provides that "[i]f supervised release is revoked, the court may include a requirement that the defendant be placed on a new term of supervised release upon release from imprisonment." However, the term may not exceed the term of supervised

---

[2] The periods of imprisonment authorized by statute for a violation of the conditions of supervised release are limited by statute. For example, under 18 U.S.C. § 3583(e)(3), the period of imprisonment for a Class C felony cannot exceed two years.

3

release authorized by statute for the offense that resulted in the original term of supervised release, minus any term of imprisonment imposed for the violation.

The Application Notes to §7B1.3 describe those circumstances when revocation of supervised release is appropriate: "Revocation of . . . supervised release is generally the appropriate disposition in the case of a Grade C violation by a defendant, who having been continued on supervision after a finding of violation, *again violates* the conditions of his supervision." USSG § 7B1.3, comment (n.1) (emphasis added).

## The Nature and Circumstances of the Violations

1. Charge 1: Unauthorized Use of a Computer.

Although the parties agreed that this charge will be dismissed at sentencing, in her Dispositional Memorandum, the Probation Officer alleged that Linder misused his computer by viewing pornography. As noted above, however, the judgment and sentence imposed by Judge Karlton did not include a prohibition against viewing adult pornography, unless it contained certain "sexually explicit conduct," and the dating sites Linder viewed did not meet this definition.

Moreover, beginning with his first monthly report in July 2015, Linder reported viewing pornography. (See Exhibits 1-6). The Probation Officer's allegation that Linder was directed by his previous probation officers not to view pornography is inaccurate. Instead, what Officer Simon told Linder in January 2016 was that viewing pornography would be inconsistent with group therapy. However, Linder was not in group therapy then, and Mr. Simon instead directed Linder to discuss the issue with his individual therapist, who, at the time, was Gary Nichols.[3]

---

[3] Linder was never in group therapy during his term of supervision leading up to these proceedings, and the reason is simple: his two therapists, Gary Nichols, LCSW and Marcia Rogers, LCSW both recommended against it. In fact, Mr. Nichols advised the Probation Office that Linder successfully completed all of the requirements and assignments dictated by Federal Probation Adult Sex Offenders program during the course of his individual therapy. Yet, in spite of these professional recommendations, Officer Farahmand has recently ordered Linder to participate in group therapy sessions, which he has been attending. Nevertheless,

On the other hand, Officer Simon did direct Linder not to view XXX websites, a directive which Linder consistently complied with throughout his period of supervised release. Officer Simon did allow Linder to view dating websites, however, and when Linder believed he might have accidently viewed XXX pages while on a dating website, he immediately informed Officer Simon in an email dated October 17, 2017. (See Exhibit 7). Since that time, there is no evidence that Linder has visited any XXX websites.

Significantly, what the Dispositional Memorandum addresses regarding Charge 1 is a retrospective review of Linder's computer use. That is, on **November 2, 2017**, when Officer Farahmand met with Linder to discuss the "sexually explicit content" that was found on the monitoring program installed on his computer, she was referring to content that Linder viewed more than **nine months** before, which involved male dating sites that Linder was not prohibited from viewing under the original J&S, nor covered by a specific directive from his probation officer.[4] Moreover, there is nothing in the record to even suggest that Linder viewed any male dating websites or anything that can legitimately be considered pornography after Linder meet with Officers Vidales and Farahmand on **March 31, 2017**.

Consequently, the factual predicate supporting Charge 1 is inaccurate. There is no evidence to support the assertion that "[f]rom January to February 2017, the offender was using his computer to view sexually explicit content including, but not limited to, anal, oral, and orgy sex." *U.S. Probation Officer's Dispositional Memorandum*, at p. 2.

---

this new requirement may be legally suspect, since it contradicts the express language of Special Condition 9, which states: "The defendant shall attend, cooperate with, and actively participate in a sex offender treatment and therapy program, as approved and directed by the probation officer *and* as recommended by the assigned treatment provider." J&S, at p.5, ¶9 (emphasis added).

[4] The Probation Office provided this court with copies of the dating sites Linder viewed, which were addressed in an early status hearing on December 14, 2017 and there has been no finding that these dating site contained images or context prohibited by Special Condition No. 7 in the J&S.

### 2. Charge 2: Failure to Follow the Instructions of the Probation Officer.

Charge 2 relates to Linder's purchase of two UBS access devices on February 3, 2018, without prior authorization from the probation officer. Some background is necessary to fully understand the nature of this violation.

When Linder was released from federal prison and began his term of supervised release in early July 2015, Ronnie Preap was his assigned probation officer. At Officer Preap's initial home visit, Linder disclosed to him that he had two external hard drives he acquired well before his arrest that contained professional and personal files. Officer Preap took possession of and reviewed the two hard drives and gave them back to Linder several weeks later.

After Officer Simon took over supervision from Officer Preap in December 2015, Linder once again disclosed that he had the two external hard drives, offered to have Officer Simon inspect their contents. (See Exhibit 8). Officer Simon remained Linder's probation officer through December 2016 and expressed no concerns about Linder possessing and using these two hard drives.

Officer Vidales assumed Linder's supervision in January 2017. On March 31, 2017 during a meeting with Officer Vidales and Officer Farahmand, Linder *voluntarily* presented the two external hard drives which Officers Preap and Simon previously allowed him to possess and use. Nevertheless, Officer Vidales instructed Linder that he could no longer have any external hard drives in his possession because the probation office "could not appropriately monitor them.[5]" *Probation Officer's Dispositional Memorandum*, at p. 3.

---

[5] This statement is odd, since the software installed on Linder's computer monitored and recorded in real time all of his computer activity, including the insertion, removal and use of any external components. Moreover, Officer Vidales' admonition to Linder raises an obvious question: if the probation office could not appropriately monitor external hard drives, why did Officers Preap and Simon allow Linder to have them for approximately 18 months? It's also important to note that Linder's Special Conditions

On February 3, 2018, almost a year later, Linder purchased two 64 GB flash drives, and on the same day notified Officer Farahmand by email that he did so. (See Exhibit 9.). Four days later after Officer Vidales objected to the purchase, Linder turned in the flash drives to the probation office. One of the drives was still in its original package, unopened, and the other contained only a complete backup of the files on Linder's laptop.

As Linder noted in his email to Officer Farahmand, he purchased the flash drives in order back up his computer that he was using to manage the Mark Whisler Trust, which Linder served as trustee.[6] As noted in the email, Linder explained why he purchased them—to conduct periodic backups of the computer in order avoid having to use any cloud storage, which Linder was told could not be monitored by the monitoring software installed on his computer.

As noted above, although Linder did not obtain approval from his probation officer before he purchased the flash drives, he did email her the same day advising her of the purchase. Linder's email also states that he purchased Quicken—a commonly-used accounting software—and installed it on his laptop, again assuring the probation officer the ability to monitor his trustee activities. And once Officer Vidales objected to Linder having purchased the flash drives and the accounting software, they were immediately delivered to the probation office.[7]

---

did not prohibit him from possessing external drives or memory devices. Instead, they only prohibited possession of devices that could access the Internet. (See J&S Special Condition No. 4).

[6] In her Dispositional Memorandum, Officer Farahmand refers to Mr. Whisler as Linder's "deceased partner." That is inaccurate—at the time his death, Mr. Whisler was not Mr. Linder's "partner" in any romantic sense, nor did they share any business investments at that time. Among other things, the Whisler Trust consisted of 44 properties in 12 partnerships, a tax preparation business, and property management entity with 120 plus properties under active management.

[7] Thereafter, Linder sought permission from Officer Farahmand to download from his digital camera photos of the Trust properties that need to be rented, and to use

      3. <u>Charge 3: Unauthorized Possession of a Cell Phone.</u>

This charge relates to Linder having in his possession three cell phones without permission on March 2, 2018 when Officer Mamaril agreed to visit and inspect Mark Whisler's office where Linder worked.[8] One was the Android phone found plugged in next to Linder's computer at the office. The two others were defective flip phones Linder purchased a few weeks before to replace the one he first obtained when he was released from prison with permission from his probation officer.

      *a. The Android Phone*

Although the probation officer's Dispositional Memorandum states "[t]he Android is a Smart phone, with the ability to access the Internet via WiFi" it was passcode protected and could not be accessed to confirm its' technical capabilities.[9] Moreover, there is ample evidence that Linder did not have the password to open it. For example, in a letter he sent to the State of California Employment Development Department on September 25, 2017, regarding Mr. Whisler's state tax issues, Linder stated "I do not have access to Mr. Whisler's computer, email or phone, so any

---

the Quicken software that he installed on his computer but was not using per Officer Vidales' instructions. (See Exhibit 10). Furthermore, it is worth noting that nothing in the Special Conditions of the original J&S prohibited Linder from possessing or using external storage devices that did not have the ability to access any "on-line computer service." (See J&S, Special Condition 4 (Docket No. 91). Nevertheless, by admitting to the violations, Linder acknowledges that he did not "follow instructions of the probation officer." (See Standard Conditions of Supervision 3).

[8] There is no dispute that Linder had permission from the probation officer to act as the trustee of the Mark Whisler Trust, and work at out Whisler's former office, which was a 3 to 5-minute walk from Linder's home. Other than Officer Mamaril's visit to the office on March 2, 2018, no one from U.S. Probation inspected the office were Linder worked as the trustee. Officer Mamaril's visit was the first time anyone from the U.S. Probation Office accepted Linder's offer to inspect Mr. Whisler's office.

[9] The Memorandum goes on to state that the phone's "storage card was reviewed and revealed images from 2016," without any explanation what these images were or their significance to this case.

information contained on any of those devices is not available to assist in sorting this out." (See Exhibit 11).

Consequently, although this Android phone was being charged near Linder's laptop in Mr. Whisler's office, and he did not have prior permission to "possess" it, there is no evidence to suggest that Linder did use it, could use it, or intended to use it.

### b. *The Flip Phone*

In late November 2017, Linder emailed Officer Farahmand to tell her that he needed to replace his flip phone. He advised her that the "sim" card on the old phone failed, and also indicated that he did not change his service, "so still no text and no data, just a different phone." (See Exhibit 12). And on January 23, 2018, Linder once again emailed Officer Farahmand and gave her an update on his phone, this time telling her that the "new phone I had told you about and showed to you is defective, and I will be returning it." He went on to explain what happened: "[t]he phone I bought to replace the defective phone won't accept all my contacts and so is being replaced by Consumer Cellular. By next Monday or Tuesday, I should be back to a single phone, with all my contacts, capable of making all regular calls, that still won't have internet capability. At that point, I will be able to dispose of the two phones I currently have." (See Exhibit 12)

Regrettably, Linder still had the replacement phone when Officer Mamaril visited the office on March 2, 2018. Linder did explain to Officer Mamaril that due to his commitments as trustee of the Whisler Trust he did not find the time to complete the transfer of all the contacts. And although the violation is simply based upon Linder's unauthorized "possession" of the extra flip phones, like the Android, there is no evidence that he used them in any improper way. In fact, both flip phones were disabled: one could only make 911 calls, and the other had no sim card.

4. <u>Charge 4: Failure to Follow the Instructions of the Probation Officer.</u>

The probation officer's Dispositional Memorandum refers to the USB

Devices as "access devices." That is incorrect; they were only storage devices. In addition, the Memorandum states that Linder denied knowing the contents of all of them, which, again, is incorrect. The two storage devices plugged into Linder's laptop contained trust related files, one which he accessed on October 8, 2017 and the other on February 3, 2018. Of the remaining three, two were left-over promotional gifts that Mr. Whisler would routinely give to his many tax clients, located in a container on Mr. Whisler's desk. The remaining storage device was on a key ring found in a bag of several dozen keys located in a corner of Mr. Whisler's office, which can be charitably characterized as overrun with storage boxes, files and papers. (See Exhibits 13-28). Notably, there is no forensic evidence that Linder ever accessed or otherwise used these three devices.

## Conclusion

In spite of the probation officer's characterization of Linder's supervision as "a pattern of noncompliance and continued disregard for the Court's imposed conditions" the reality is that Linder has had a long history of compliance with the orders of the Court and the instructions of his probation officers. Other than his "possession" of Mark Whisler's Android phone—which may or may not have been able to have "access to any on-line computer service"— none of the violations he admitted to involved violating the expressed terms of his supervision outlined in his J&S or subsequently ordered by this or any other court. Rather, they deal with failure to follow the instructions of his probation officer.

For these transgressions, the probation officer recommends that Linder be sent back to federal prison for 4 months, to be followed by 56 months of supervised release. That is simply absurd, and it suggests that the probation officer either could not, or did not, calibrate the nature and circumstances of these transgressions, the history of Linder's compliance and his characteristics before making her recommendation.

Linder has been punished enough for his missteps; he has been on home incarceration/confinement since March of this year and was ordered to give up his trustee position shortly thereafter. Linder has learned his lesson. Enough is enough.

Dated: August 3, 2018              Respectfully submitted,

By: /s/ Joseph J. Wiseman
JOSEPH J. WISEMAN

Attorney for Defendant